IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs August 30, 2011

## STATE OF TENNESSEE v. VALENTINO L. DYER

**Direct Appeal from the Circuit Court for Rhea County**
**No. 17043     J. Curtis Smith, Judge**

**No. E2010-02578-CCA-R3-CD - Filed October 6, 2011**

The defendant, Valentino L. Dyer, was convicted by a Rhea County jury of especially aggravated burglary, especially aggravated robbery, reckless endangerment, and aggravated assault. The trial court modified the conviction for especially aggravated burglary to aggravated burglary, merged the convictions for aggravated assault and reckless endangerment into the especially aggravated robbery conviction, and sentenced the defendant as a Range II, multiple offender to concurrent terms of eight years at thirty-five percent for the aggravated burglary conviction and thirty-two years at 100 percent for the especially aggravated robbery conviction, with the sentences to be served consecutively to the defendant's sentences in another case. The defendant raises the following issues on appeal: (1) whether the indictment was defective for failing to state sufficient facts; (2) whether he adequately waived his right to testify in his own defense; (3) whether the trial court erred by disallowing evidence of the victims' alleged activity as drug dealers to show their reputation for dishonesty; (4) whether the evidence was sufficient to sustain the convictions; and (5) whether the trial court properly sentenced him as a Range II offender and whether the sentences were excessive. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and JOHN EVERETT WILLIAMS, JJ., joined.

Larry G. Roddy (on appeal) and J. Shannon Garrison (at trial), Dayton , Tennessee, for the appellant, Valentino L. Dyer.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; James Michael Taylor, District Attorney General; and Will Dunn, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

This case arises out of the defendant's participation with two accomplices, Timothy Swafford and Brian Shadden, in the April 27, 2008 break-in of the Rhea County home shared by Jarvis Copeland, his girlfriend, Amanda Roberts, and Roberts' ten-year-old son. Copeland was seriously injured in the incident, sustaining cuts to his hands from a machete swung by the defendant and severe head injuries from repeated blows from a baseball bat swung by Shadden. The men stole Copeland's wallet and car keys and broke into his vehicle parked outside before fleeing from the scene. They were jointly indicted for especially aggravated burglary, especially aggravated robbery, attempted first degree murder, and aggravated assault. Swafford and Shadden subsequently negotiated plea bargains with the State, and each was called as a witness for the defense at the defendant's July 28-30, 2009 trial.

### State's Proof

The victim, Jarvis Copeland, testified that on April 27, 2008, he was living in Dayton with his then-girlfriend, Amanda Roberts, and her young son and was in the process of starting a pressure-washing business with funds he had received from an insurance settlement and from cashing out a 401(k). That night, he returned home late and fell asleep in his clothes to be awakened sometime between 2:00 and 3:00 a.m. by the sound of loud knocking and a voice shouting "Police!" or something similar. When he heard the sound of glass breaking, he realized that someone had broken into the home and began running toward the living room, where he encountered the defendant, who was armed with a machete. The victim made a positive courtroom identification of the defendant and said that he was easily able to identify all three of the intruders who broke into his home, despite the fact that they wore stocking caps on their heads and bandanas around their necks, as Tim Swafford, Brian Shadden, and the defendant. According to the victim, the defendant and Swafford had come to the house a day or two before the burglary to borrow a cell phone charger from Roberts.

The victim testified that the defendant swung the machete at him and that he caught its blade with his hand. The defendant swung the machete at him a second time, and he again caught the blade and hung on with both hands. The defendant, however, was able to pull the machete from the victim's grasp. At that point, the victim fled to the kitchen, where he tripped over a mop bucket and fell onto the broken glass on the floor. As he was attempting to get back up, he was pulled by the legs and repeatedly struck in the head with a baseball bat.

The victim testified that Roberts kept yelling at him to stop fighting the men; he felt, however, that he was "fighting for [his] life." He eventually ended up in the bedroom with Roberts and her son, where he saw Shadden holding a baseball bat and standing in the corner while Swafford rummaged through the room yelling, "Where is it at? Where is the money? Where is it at?" In the meantime, Roberts kept pleading with Shadden to be allowed to go to the bathroom to get some towels to bandage the victim's hands. Shadden, who said that he did not know there was going to be a child in the home, eventually relented and allowed Roberts to retrieve the towels. The victim also recalled that Swafford threatened to start shooting if they did not reveal the location of the money. The victim did not know where the defendant was during this time.

The victim testified that after "so many minutes" the men fled from the house, taking his wallet and his car keys. He identified photographs of the numerous wounds he received in the attack, including the injuries to his hands caused by the machete and injuries to his head caused by the baseball bat. He said he underwent surgery to remove a blood clot from his brain as well as a series of surgeries to repair nerve damage and severed tendons in his hands.

On cross-examination, the victim said he could not recall having told the police officers who responded to the scene that he had recognized the intruders. He denied that he and Roberts were drug dealers, that they ran a "crack house," or that he had cheated the defendant in a drug deal.

Amanda Roberts testified that she had known the defendant, a distant relative, for her whole life and had known Tim Swafford for two or three years. On the day before the burglary, Swafford, who was accompanied by the defendant, came to her home to borrow a cell phone charger. The next night, she was praying in bed when she heard the sound of the door being kicked in and someone yelling, "Police, Police." She knew, however, that it was not the police as soon as she saw the masks and clothing that the intruders were wearing.

Roberts testified that she recognized the defendant and Swafford when they ran past her toward the living room as she was running to her son's bedroom. She said she heard them fighting with the victim, ran back, and saw the defendant twice swing his machete at the victim. The victim caught the blade in his hands each time, and the men began wrestling. At some point during the struggle, the victim's head was split open from a blow from a baseball bat, which she assumed had been swung by Shadden. Roberts recalled that the men demanded money, with Swafford at one point threatening to shoot the victim if they did not give it to him.

Roberts testified that the severely injured victim eventually ended up in the bedroom with her and her son. She said that Shadden kept them trapped in place by threatening them with the baseball bat while Swafford and the defendant "t[ore] the house up trying to find money." Shadden, whom Roberts had never seen before that night, kept saying that he did not know that there would be any children in the house and he eventually allowed Roberts to retrieve some towels to bind the victim's wounds.

On cross-examination, Roberts acknowledged that she initially described the defendant and Swafford as "a black guy and a white guy," without mentioning their names. She said she was "a wreck" in the immediate aftermath of the ordeal and that she identified the perpetrators by name as soon as the victim went into surgery and she was assured that her son was all right. She denied that she or the victim were drug dealers or that they had drugs in the home.

Dayton Police Officer Jason Woody, who was dispatched to the scene in response to a 9-1-1 call of a screaming woman, testified that upon his arrival he heard screaming from the house and saw a man about to enter the driver's side of an SUV parked outside. The man turned and fled when Officer Woody yelled, and Officer Woody pursued him on foot. Officer Woody was forced to give up the chase, however, when he fell and injured himself while attempting to follow the man over a wall. Officer Woody identified photographs of the clothing the man shed during his flight, which included a black sweatshirt, a glove, and two bandanas. He also identified items he found outside the victim's home, which consisted of a set of car keys on the ground beside the driver's door of the SUV, a baseball bat at the left rear side of the vehicle, and a bloody machete located in an area between the victim's home and the house next door. He said that as he started his pursuit of the fleeing man he glimpsed the outline of one or two other individuals who were on the passenger side of the SUV.

Officer Woody further testified that while he was still at the scene two young fishermen approached, told him that they had seen a man run down the hill and climb a tree by the river, and pointed out the tree. When he investigated, he discovered Brian Shadden sitting on a branch of the tree approximately sixteen to eighteen feet off the ground. He said that Shadden began to climb down at his command but then lost his balance and fell head first, with a wallet containing the victim's identification landing at the base of the tree seconds before he hit the ground.

Dayton Police Officer Brian Malone, who arrived at the scene a few seconds after Officer Woody, testified that victim was "a bloody mess," had "kind of a blank look" on his face, and was initially unable to respond to his questions. Blood was everywhere, and the home had been ransacked.

Investigator Darrell Bell of the Dayton Police Department testified that his investigation, which included an interview of Brian Shadden, led him to develop Tim Swafford and the defendant as the two other individuals involved in the crimes. He arrested both men the next day and took statements from the defendant on April 28 and April 29, 2008. The CDs of both statements, as well as the transcripts prepared from those statements, were admitted as exhibits and published to the jury. In the first statement, the defendant said that he had accompanied Swafford, Shadden, and "some white girl" to Walmart, where he paid for some items that they wanted, including a baseball bat, a machete, some cable ties, and a stocking cap. He said that the men promised to repay him and that he was unsure of exactly what they bought because he was drunk at the time. Later that night, the girl dropped him and the other two men off at Roberts' house because Swafford and Shadden thought they could find some drugs there.

The defendant said that Shadden was armed with the bat and the machete and that Swafford used a crowbar to pry the door open. He denied that he had any weapon. He stated that Shadden and Swafford entered the house and that a struggle ensued in which "someone got hit with a bat." The defendant claimed that he left at that point because there was "stuff going on and [he] couldn't take it." He stated that he was instructed to act as a lookout and that he might have stepped approximately one foot into the house but that he never participated in the fight with the victim.

The following day, the defendant asked to speak to Investigator Bell again. In his second statement, he admitted that he had been armed with a machete and had entered the house. He said that the victim grabbed the blade of the machete and that they fought over its control before he managed to pull it from the victim's grasp. He denied, however, that he swung the machete at the victim or anyone else. He stated that after Shadden started hitting the victim with a bat and blood went everywhere, he could not take it anymore and left the house. He insisted that no one was supposed to get hurt and said that he did not receive anything from the burglary but had heard that Swafford got a small amount of marijuana.

Investigator Bell identified the various items that were recovered in connection with the case, which included the victim's papers and billfold and a small amount of marijuana that were recovered from the site of Shadden's arrest and a crow bar that was found beside the victim's SUV at the residence.

**Defendant's Proof**

Timothy Swafford testified that he, Shadden, and the defendant decided to rob the victim and his girlfriend because they were "drunk and messed up" and were seeking "[d]ope

-5-

and money." Specifically, they were looking for marijuana and crack cocaine because the victim and Roberts were known to sell drugs and their home was "a known crack house." He had, in fact, purchased crack cocaine and marijuana from them in the past, including only two days before the burglary when he, the defendant, Shadden, and a fourth individual had bought some marijuana from Roberts at the home. He said that on the night of the burglary, the victim laid out for them approximately two ounces of crack cocaine and six or seven bags of marijuana. In addition, they took the victim's wallet, car keys, and approximately $2500 in cash that they found in his closet. He stated that he was armed with a crowbar, Shadden with a bat, and the defendant with a machete and that he and Shadden each struck the victim with their respective weapons but that they had no intent to kill him. Finally, he testified that he saw the defendant "fighting" with the victim but never saw him strike him with the machete.

Brian Shadden testified that he and his companions decided to commit the crimes because the victim and Roberts were known drug dealers in the community and they believed they would find drugs and money in their home. He testified that he did not find any money, but he thought that Swafford had found some cash and crack cocaine.

**Sentencing Hearing**

The trial court found the defendant to be a Range II, multiple offender based on his two prior felony convictions for aggravated assault. The trial court applied two enhancement factors: that the defendant had a previous history of criminal convictions in addition to those necessary to establish his range and that he was on probation at the time he committed the offenses, see Tenn. Code Ann. § 40-35-114(1), (13) (2010), and found no applicable mitigating factors. Consequently, the court sentenced the defendant to concurrent terms of thirty-two years for the Class A felony conviction of especially aggravated robbery and eight years for the Class C felony conviction of aggravated burglary, with the sentences to be served consecutively to his sentences in the aggravated assault cases, for which the defendant had been on probation at the time he committed the instant offenses.

**ANALYSIS**

**I. Defective Indictment**

The defendant contends that the indictment was fatally defective because it "simply recited the statute relative to the charges and did not contain facts and circumstances which would constitute the crime." The State responds by arguing that the defendant has waived this issue by failing to raise it in a pretrial motion and that, even if not waived, the indictment was more than sufficient to put the defendant on notice of the charges he would be required

to defend. We agree with the State.

Pursuant to both the United States and Tennessee Constitutions, a criminal defendant has the right to know "the nature and cause of the accusation" against him, U.S. Const. amend. VI, Tenn. Const. art. I, § 9; and the overriding purpose of an indictment is to provide notice to the accused of the charges he will be called to defend. "Generally stated, an indictment is valid if it provides sufficient information (1) to enable the accused to know the accusation to which answer is required, (2) to furnish the court adequate basis for the entry of a proper judgment, and (3) to protect the accused from double jeopardy." State v. Hill, 954 S.W.2d 725, 727 (Tenn. 1997). Additionally, an indictment must state the facts of the offense in an ordinary and concise language "in a manner so as to enable a person of common understanding to know what is intended." Tenn. Code Ann. § 40-13-202 (2010).

Tennessee Rule of Criminal Procedure 12(b)(2)(B) provides that a motion alleging a defect in an indictment, presentment, or information must be raised before trial "but at any time while the case is pending, the court may hear a claim that the indictment, presentment, or information fails to show jurisdiction in the court or to charge an offense."

The defendant's challenge to the indictment is not that the trial court lacked jurisdiction over his case or that the indictment failed to charge an offense, but rather that the offenses were not sufficiently detailed in the indictment. We, therefore, agree with the State that he has waived the issue by not raising it in a pretrial motion.

We further agree that, even if not waived, the defendant would not be entitled to any relief on the basis of this issue. In addition to reciting the relative statutes for each charged offense, the indictment listed the names of the defendants, the date on which the offenses took place, the names of the victims, the weapons used, the items taken, and the serious bodily injury caused to one of the victims. Counts one and two of the indictment, for example, state in pertinent part that

> **Valentino L. Dyer, Timothy A. Swafford and Brian E. Shadden** on the 27th day of April, 2008 in Rhea County, Tennessee, and before the finding of this indictment, did unlawfully and knowingly enter the habitation of **Jarvis Copeland and Amanda Roberts**, without the effective consent of the said **Jarvis Copeland and Amanda Roberts**, said habitation not open to the public, with the intent to commit a felony, theft or assault, and did cause serious bodily injury to the said **Jarvis Copeland**, in violation **of T.C.A. 39-14-404**, . . .

[and]

did unlawfully and knowingly obtain control of **a wallet containing personal identification and a set of keys** being the personal property of **Jarvis Copeland**, without the owner[']s consent and with the intent to deprive the true owner thereof. Said theft of property was from the person of **Jarvis Copeland** by violence and accomplished by the use of a deadly weapon, to wit: **a ball bat and a machete**, as a result of which the said Jarvis Copeland suffered serious bodily injury, in violation of **T.C.A. 39-13-403**[.]

The indictment, thus, was sufficiently detailed to achieve its overriding purpose of providing notice to the defendant of the charges against him.

## II. Waiver of Right to Testify

The defendant contends that he was inadequately advised of his right to testify, asserting that the colloquy between himself and counsel failed to satisfy the requirements of Momon v. State, 18 S.W.3d 152 (Tenn. 1999), because he was not advised on the record of the advantages and disadvantages of testifying, informed that the jury could not draw any negative inferences from his failure to testify, and told that no one could prevent him from testifying. Pointing out that strict compliance with the guidelines of Momon is not required, the State asserts that the record reveals that the defendant personally waived the right to testify after demonstrating his awareness of his rights. We, again, agree with the State.

In Momon, our supreme court held that the right of a defendant to testify in his or her own behalf is a fundamental constitutional right that must be personally waived by the defendant. Id. at 161. To ensure that the defendant has personally waived that right, "defense counsel shall request a hearing, out of the presence of the jury, to inquire of the defendant whether the defendant has made a knowing, voluntary, and intelligent waiver of the right to testify." Id. at 162. No particular litany need be used; however, defense counsel must at a minimum show "that the defendant knows and understands that":

(1) the defendant has the right not to testify, and if the defendant does not testify, then the jury (or court) may not draw any inferences from the defendant's failure to testify;

(2) the defendant has the right to testify and that if the defendant wishes to exercise that right, no one can prevent the defendant from testifying;

(3) the defendant has consulted with his or her counsel in making the decision whether or not to testify; that the defendant has been advised of the advantages and disadvantages of testifying; and that the defendant has voluntarily and

-8-

personally waived the right to testify.

Id. at 162. These procedures are "prophylactic measures which are not themselves constitutionally required." Id. at 163. Therefore, the failure to follow the above guidelines will not be enough to show that a defendant was deprived of the constitutional right to testify "if there is evidence in the record to establish that the right was otherwise personally waived by the defendant." Id.

In his jury-out colloquy with his trial counsel, the defendant affirmed that counsel had discussed with him his decision with respect to testifying, that it was counsel's recommendation that he not testify because the State could impeach his credibility with his prior convictions, and that he had decided to follow counsel's advice and not testify. He also affirmed that he realized that the decision was his alone and that he could testify regardless of counsel's advice. He said, however, that he believed that "everything that need[ed] to be known [was] already known." Upon further questioning by the prosecutor, the defendant reiterated that he realized that he had the right to testify in his own defense and that it was his decision not to testify. The prosecutor then informed him that the State was withdrawing its right to impeach him with two of his prior convictions. At that point, trial counsel told the defendant that he still advised that he not take the stand, and the defendant, without hesitation, assured the trial court that the prosecutor's decision about those convictions did not cause him to change his mind about testifying. We, thus, agree with the State that the record shows that the defendant voluntarily and personally waived his right to testify in his own defense.

### III. Evidence of the Victim's and Roberts' Alleged Drug Dealing

The defendant contends that the trial court erred by not allowing him to present evidence of the victim's and Roberts' alleged drug dealing activity in order to impeach their testimony about their legitimate sources of income and to show their reputations for dishonesty in the community. After a lengthy jury-out discussion, the court ruled that the evidence was collateral and inadmissible. The court, however, allowed the defendant to make a jury-out offer of proof of the testimony of the following three individuals: Greg Cox, Brandi Hyatte, and Kellon Gillespie. Cox testified that he knew the victim and Roberts through "drug deals," having purchased drugs from them numerous times in the past. Based on that experience, he did not believe the victim to be a truthful person. Hyatte testified that the victim and Roberts had reputations in the community as drug dealers but that she had never purchased any drugs from them. Finally, Gillespie testified that the victim and Roberts had reputations as drug dealers and, as such, in his opinion were not truthful people.

The defendant argues that the State "opened the door" to such evidence by eliciting

the victim's and Roberts' testimony about their legitimate sources of income, which made his proposed testimony "relevant" and "vital to his defense." He further argues that the evidence was "admissible through numerous provisions of the rules of evidence" and that its exclusion violated "his fundamental rights to a Fair Trial and Due Process." We respectfully disagree.

Rulings on the admissibility of evidence based on its relevance are entrusted to the sound discretion of the trial court and will not be overturned absent an abuse of that discretion. State v. Thomas, 158 S.W.3d 361, 395 (Tenn.), cert. denied, 546 U.S. 855 (2005). "'[A]n appellate court should find an abuse of discretion when it appears that a trial court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining.'" Id. (quoting State v. Shuck, 953 S.W.2d 662, 669 (Tenn. 1997)).

Tennessee Rule of Evidence 609 provides that the credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation but that the evidence may refer only to character for truthfulness or untruthfulness. Tenn. R. Evid. 609(a). Specific instances of conduct of a witness for the purpose of attacking or supporting the witness's character for truthfulness may not be proved by extrinsic evidence but may, subject to certain limiting conditions, be inquired into on cross-examination of the witness. Tenn. R. Evid. 609(b). As stated in Tennessee Law of Evidence:

> If the fact being contradicted is deemed collateral, counsel must use cross-examination of the witness being impeached to bring out the contradictory fact and must accept the witness's response, even if it is a denial that counsel could disprove. Counsel cannot prove the fact by such extrinsic proof as the testimony of other witnesses. The collateral fact rule is designed to save time and prevent confusing the jury and "uselessly to protract and increase the expense of judicial investigations."

Neil P. Cohen et al., Tennessee Law of Evidence, § 6.07[4][b] (5th ed. 2005) (quoting State v. Leach, 148 S.W.3d 42, 56 (Tenn. 2004)).

We agree with the trial court that the testimony the defendant sought to present about the victims' alleged drug activity and reputation as drug dealers was collateral and inadmissible. We conclude, therefore, that the trial court properly excluded the evidence.

### IV. Sufficiency of the Evidence

The defendant contends that the trial court should have granted his motion for

judgment of acquittal because the proof was insufficient to sustain his convictions. In support, he asserts that the testimony of both the victim and his girlfriend, who were well-known drug dealers and who failed to immediately identify the perpetrators to the police, was "incredible." The State argues that the evidence was sufficient to sustain the convictions, and we agree.

"The standard by which the trial court determines a motion for judgment of acquittal at the end of all the proof is, in essence, the same standard which applies on appeal in determining the sufficiency of the evidence after a conviction." State v. Thompson, 88 S.W.3d 611, 614-15 (Tenn. Crim. App. 2000); see also State v. Blanton, 926 S.W.2d 953, 957-58 (Tenn. Crim. App. 1996). Thus, the question for this court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)).

"A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d

913, 914 (Tenn. 1982).

To sustain the conviction for aggravated burglary, the State had to prove beyond a reasonable doubt that the defendant entered Copeland's and Roberts' habitation with the intent to commit a felony or theft. Tenn. Code Ann. § 39-14-403. To sustain the conviction for especially aggravated robbery, the State had to show beyond a reasonable doubt that the defendant committed an intentional or knowing theft of property from Copeland that was accomplished with a deadly weapon and where Copeland suffered serious bodily injury. Tenn. Code Ann. § 39-13-403.

Viewed in the light most favorable to the State, the evidence showed that the defendant accompanied Shadden and Swafford to the store to purchase weapons and disguises and then went with them to the home of Copeland and Roberts with the intention to rob them. There, the men broke into the home, demanded money, repeatedly struck the victim with a machete, a ball bat, and a crowbar, causing him to suffer serious, life-threatening injuries, ransacked the home, took the victim's wallet and car keys, and then fled from the scene. This was more than sufficient proof by which a jury could find the defendant guilty of the offenses beyond a reasonable doubt. We conclude, therefore, that the evidence was sufficient to sustain the defendant's convictions for aggravated burglary and especially aggravated robbery.

## V. Sentencing

Lastly, the defendant challenges his classification as a Range II, multiple offender and the length of the sentences imposed by the trial court. Specifically, he argues that the trial court should not have sentenced him as a Range II offender because the State filed a defective notice to seek enhanced punishment, in that it erroneously listed one of his two qualifying felonies as an aggravated robbery instead of an aggravated assault. He also argues that the State could not have relied on those two aggravated assault convictions, regardless of notice, because they occurred on the same date and the State failed to show that either one involved bodily injury or threatened bodily injury. He makes no specific argument against the trial court's application of enhancement factors or the length of his sentences within the range.

When an accused challenges the length and manner of service of a sentence, it is the duty of this court to conduct a *de novo* review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The presumption does

not apply to the legal conclusions reached by the trial court in sentencing the accused or to the determinations made by the trial court which are predicated upon uncontroverted facts. State v. Butler, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); State v. Smith, 891 S.W.2d 922, 929 (Tenn .Crim. App. 1994); State v. Bonestel, 871 S.W.2d 163, 166 (Tenn. Crim. App. 1993), overruled on other grounds by State v. Hooper, 29 S.W.3d 1, 9 (Tenn. 2000).

In conducting a *de novo* review of a sentence, this court must consider (a) any evidence received at the trial and/or sentencing hearing, (b) the presentence report, (c) the principles of sentencing, (d) the arguments of counsel relative to sentencing alternatives, (e) the nature and characteristics of the offense, (f) any mitigating or enhancement factors, (g) any statistical information provided by the administrative office of the courts as to Tennessee sentencing practices for similar offenses, (h) any statements made by the accused in his own behalf, and (i) the accused's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-103, -210; State v. Taylor, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Commission Cmts.; Ashby, 823 S.W.2d at 169.

In imposing a specific sentence within a range, a trial court "shall consider, but is not bound by" certain advisory sentencing guidelines, including that the "minimum sentence within the range of punishment is the sentence that should be imposed" and that "[t]he sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors[.]" Tenn. Code Ann. § 40-35-210(c)(1), (2). The weighing of the various mitigating and enhancement factors is "left to the trial court's sound discretion." State v. Carter, 254 S.W.3d 335, 345 (Tenn. 2008).

The defendant first contends that the State's notice of intent to seek Range II classification was defective because one of the qualifying felonies was erroneously listed as an aggravated robbery rather than an aggravated assault. We agree with the State, however, that the defendant not only waived the issue by not raising it prior to or during the sentencing hearing, see Tenn. R. App. P. 36(a), but also is unable to show that he was prejudiced as a result of the error. During his discussion with the prosecutor at trial about his prior impeaching convictions, the defendant asserted that he had pled guilty to two counts of aggravated assault rather than one count of aggravated assault and one count of aggravated robbery, as the prosecutor believed. The prosecutor conceded that he might have been mistaken and, while someone was being sent to retrieve copies of the judgments, announced that he was withdrawing his right to impeach the defendant's testimony with those two convictions. He added, however, that he was not withdrawing his notice to seek Range II sentencing based on those convictions. The defendant offered no objection to the proposed Range II classification, either at that time or at his later sentencing hearing.

Copies of the judgments, which were introduced at the sentencing hearing, reveal that the defendant was indicted for two counts of aggravated robbery and pled guilty to two counts of aggravated assault. Although he made no argument on this issue at sentencing, the defendant now contends that the two convictions should have been counted as a single conviction for the purposes of determining his range classification because the offenses occurred on the same date and the State failed to prove that they were not based on the subsection of the aggravated assault statute that makes it a crime for a parent or custodian to intentionally or knowingly fail or refuse to protect a child or adult from an aggravated assault or aggravated child abuse. See Tenn. Code Ann. § 39-13-102(b) (2010). We conclude, however, that even if not waived, the defendant would not be entitled to relief on the basis of this issue. First, he was indicted for especially aggravated robbery, not some kind of child abuse. Moreover, we disagree with his contention that the statutory elements of subsection (b) of the aggravated assault statute do not "include serious bodily injury, bodily injury, threatened serious bodily injury or threatened bodily injury to the victim or victims." See Tenn. Code Ann. § 40-35-106(b)(4) ("Except for convictions for which the statutory elements include serious bodily injury, bodily injury, threatened serious bodily injury, or threatened bodily injury to the victim or victims, . . . , convictions for multiple felonies committed within the same twenty-four-hour period constitute one (1) conviction for the purpose of determining prior convictions."). We, therefore, affirm the sentences imposed by the trial court.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE

-14-